Exhibit ''B''

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
**Salvador Sanchez on 03/10/2021**

```
 1                 UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

 3

 4   PAOLA FRENCH and RUSSELL FRENCH,      )
                                           )
 5                  Plaintiffs,            )
                                           )
 6                  vs.                    ) Case No.
                                           ) 5:20-CV-00416-JGB-SP
 7   CITY OF LOS ANGELES; SALVADOR SANCHEZ;)
     and DOES 1-10, inclusive,             )
 8                                         )
                    Defendants.            )
 9   _____)

10

11

12

13

14         VIDEOTAPED REMOTE VIDEOCONFERENCE DEPOSITION OF

15                       SALVADOR SANCHEZ

16                   WEDNESDAY, MARCH 10, 2021

17

18

19

20

21

22

23   Reported Stenographically by:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  332601
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 2

```
 1                    UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

 3

 4   PAOLA FRENCH and RUSSELL FRENCH,    )
                                          )
 5                  Plaintiffs,           )
                                          )
 6              vs.                       ) Case No.
                                          ) 5:20-CV-00416-JGB-SP
 7   CITY OF LOS ANGELES; SALVADOR SANCHEZ;)
     and DOES 1-10, inclusive,           )
 8                                        )
                    Defendants.           )
 9   _____)

10

11

12

13

14           The videotaped remote videoconference deposition of

15   SALVADOR SANCHEZ, taken on behalf of the Plaintiffs,

16   beginning at 9:37 a.m., and ending at 4:35 p.m., on

17   Wednesday, March 10, 2021, before Jinna Grace Kim, a

18   Certified Stenographic Shorthand Reporter No. 14151, reported

19   from Sherman Oaks, California, licensed in State of

20   California.

21

22

23

24

25
```

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.

Salvador Sanchez on 03/10/2021                                    Page 3

```
 1      APPEARANCES OF COUNSEL:

 2
        For the Plaintiffs:
 3
                    LAW OFFICES OF DALE K. GALIPO
 4                  BY:   DALE K. GALIPO, ESQ.
                    BY:   RENEE V. MASONGSONG, ESQ.
 5                  BY:   ERIC VALENZUELA, ESQ.
                    21800 Burbank Boulevard, Suite 310
 6                  Woodland Hills, California 91367
                    Tel:  818-347-3333
 7                  Fax:  818-347-4118
                    E-mail:  dalekgalipo@yahoo.com
 8                  E-mail:  rvalentine@galipolaw.com
                    E-mail:  evalenzuela@galipolaw.com
 9

10      For the Defendants:

11                  CITY OF LOS ANGELES
                    BY:   CORY M. BRENTE, ESQ.
12                  BY:   COLLEEN R. SMITH, ESQ.
                    City Hall East
13                  200 N. Main Street, 6th Floor
                    Los Angeles, California 90012
14                  Tel:  213-978-6900
                    Fax:  213-978-8785
15                  E-mail:  cory.brente@lacity.org
                    E-mail:  colleen.smith@lacity.org
16

17                  LEWIS BRISBOIS BISGAARD & SMITH, LLP
                    BY:   DANA A. FOX, ESQ.
18                  633 West 5th Street, Suite 4000
                    Los Angeles, California 90071
19                  Tel:  213-680-5104
                    Fax:  213-250-7900
20                  E-mail:  dana.fox@lewisbrisbois.com

21

22

23

24

25
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
**Salvador Sanchez on 03/10/2021**                                    **Page 4**

```
 1                            INDEX

 2   WITNESS:                                          PAGE

 3   SALVADOR SANCHEZ

 4      BY: MR. GALIPO                                 6

 5      BY: MR. BRENTE                                 63

 6      BY: MR. GALIPO                                 148

 7      BY: MR. BRENTE                                 152

 8

 9                          EXHIBITS

10   MARKED FOR IDENTIFICATION                         PAGE

11   Exhibit 1               Policies                  21

12   Exhibit 2               Employees Report          28

13   Exhibit 3               Discovery Responses       31

14   Exhibit 4               Photograph                38

15   Exhibit 5               Photograph                39

16   Exhibit 6               Salvador Sanchez's Responses 39
                             to Co-Defendant City of Los
17                           Angeles Request for
                             Admissions Set One
18
     Exhibit 7               Salvador Sanchez's Responses 40
19                           to Co-Defendant City of Los
                             Angeles' Special
20                           Interrogatorries Set One

21

22

23

24

25
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 5

```
 1                          CALIFORNIA

 2                  WEDNESDAY, MARCH 10, 2021

 3                         9:37 P.M.

 4          THE VIDEOGRAPHER:  Good morning.  This is the

 5   beginning of Media No. 1 in the deposition of Salvador

 6   Sanchez, in the matter of Paola and Russell French v. the

 7   City of Los Angeles.  Case number is 5:20-CV-00416-JGB-SP,

 8   filed in the United States District Court for the Central

 9   District of California, Eastern Division.

10          Today's date is March 10, 2021.  Time on the video

11   monitor is 9:37.  My name is Stephen Smith, and I'm a notary

12   public and the videographer.  The court reporter is Jinna

13   Kim.

14          Attorneys participating in this proceeding

15   acknowledge that I'm not physically present in the proceeding

16   room and that I will be videotaping this proceeding remotely.

17          MR. GALIPO:  Yes --

18          THE VIDEOGRAPHER:  Counsels, please introduce

19   yourselves after which the court reporter will swear in the

20   witness.

21          MR. GALIPO:  Dale Galipo, appearing on behalf of the

22   Plaintiffs.  Also Renee Masongsong from my office is on the

23   call and attorney Eric Valenzuela is sitting next to me in

24   the conference room that I am in.  And we have Kevin French

25   who will only be listening to the deposition.
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 11

```
1              MR. GALIPO:  Okay.  We went off the record for a

2   short period of time just to improve the sound, and I think

3   that was an improvement.  So thank everyone for that.

4   BY MR. GALIPO:

5      Q.   And I think we were talking about the academy, and

6   you were saying that there were three different locations.

7              One on Manchester.  One on Granada Hills.

8              And where was the third?

9      A.   The third was Elysian Park.

10     Q.   Okay.  And when approximately did you graduate from

11  the academy?

12     A.   Approximately November of 2012.

13     Q.   Now, while you were at the academy, did you have

14  some training with respect to tactics?

15     A.   Yes.

16     Q.   And did you have some training with respect to the

17  use of force?

18     A.   Yes.

19     Q.   And did that include both lethal force and

20  none-lethal force?

21     A.   Yes.

22     Q.   And do you recall having to study POST Learning

23  Domains?

24     A.   Yes.

25     Q.   And so after graduating from the academy, where did
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 13

1       A.    Yes.

2       Q.    And how long did you have that particular

3    assignment?  In other words, once you finished field training

4    and you were partnered up on patrol, were you on patrol for

5    several years?

6       A.    Yes.

7       Q.    Did your assignment change at any point in time

8    before the incident at Costco?

9       A.    Yes.

10       Q.    Can you kind of take us, please, through your

11    assignments?  In other words, what your initial assignment

12    was and then what it changed to?

13       A.    Yes.  So at Wilshire Division I completed my field

14    training.  I continued with patrol.  From Wilshire Division I

15    transferred over to Custody Services Division.  That's --

16    that was a six-month assignment, working in custody.

17    Following that I transferred to Rampart Division for patrol.

18    While in Rampart I then was reassigned to work the Bicycle

19    Detail.  Following that assignment I went to Southwest

20    Division Gang Enforcement Detail.  Following that assignment,

21    I -- I reassigned -- I was reassigned -- or let me rephrase

22    that.  I -- I chose to be reassigned to Patrol Division

23    within Southwest Division.

24       Q.    Was that your assignment as of the time of the

25    incident at Costco?

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.
Salvador Sanchez on 03/10/2021                                    Page 14

1        A.    Yes.

2        Q.    Just to follow up a little bit, the bicycle

3   assignment, what did that involve, generally?

4        A.    Patrolling.  Just the -- the assignment is more

5   specific to locations where the bicycle enforcement is a

6   better means of transportation for community service for

7   various persons in that area in particular.  This -- as an

8   example, it may include a city park.

9        Q.    Okay.  So was it generally similar to a patrol

10  assignment, but just on a bicycle because it was better for

11  the location?

12       A.    Correct.

13       Q.    And then what year or years did you do the bicycle

14  detail?

15       A.    This is an approximation.  But it would be between

16  fall of 2015 to fall of 2017.

17       Q.    And the Southwest Gang Enforcement Detail, I assume

18  that dealt with working gangs?

19       A.    Yes.

20       Q.    And what time period did you do that?

21       A.    That is estimated between spring of 2018 to early

22  2019.

23       Q.    Okay.  And then is that when you went back to

24  patrol?

25       A.    Yes.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 16

1        A.   Yes, I have.

2        Q.   And on how many occasions, approximately?

3        A.   I would approximate -- I approximate twice.

4        Q.   Okay.  And had you ever seen a suspect like with a

5    knife in their hand before?

6        A.   Yes, I have.

7        Q.   Okay.  And do you have an estimate as to how many

8    times?

9        A.   I would estimate five times.

10       Q.   Okay.  Would you normally carry a Taser on you when

11   you were on patrol?

12       A.   Yes.

13       Q.   Had you ever tased anyone in the field before the

14   day of this incident?

15       A.   Yes.

16       Q.   And do you have an estimate as to on how many

17   occasions?

18       A.   I would estimate five times.

19       Q.   Would you normally carry pepper spray?

20       A.   Yes.

21       Q.   And had you ever pepper-sprayed anyone in the field

22   before the day of the incident?

23       A.   No.

24       Q.   Would you carry a police baton?

25       A.   Yes.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 19

1      Q.    Okay.  How tall are you?

2      A.    Estimate, 5-foot-7.

3      Q.    Okay.  And how much do you currently weigh?

4      A.    I would approximate 200 pounds.

5      Q.    And what would you estimate that your weight was at

6    the time of the incident at Costco?

7      A.    I would approximate a 190 pounds.

8      Q.    You would estimate you gained approximately ten

9    pounds?

10     A.    Yes.  Pandemically.

11     Q.    Yes.  Well, you're not the only one.

12           Except I'm sure Mr. Fox has kept and Mr. Brente have

13    kept their fine weight down.

14           MR. FOX:  I like that new adjective, pandemically.

15           I'm going to use that, Sal.  Thank you.  That's a

16    good one.

17    BY MR. GALIPO:

18     Q.    Okay.  The day, if we went to the day before the

19    incident at Costco, did you have any physical injuries or

20    complaints of pain the day before the incident at Costco?

21     A.    No.

22     Q.    Were you seeing a medical doctor for any reason

23    before the incident at Costco?

24     A.    Yes.

25     Q.    And what were you seeing a medical doctor for?

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 20

```
 1              MR. FOX:  And, Sal, it should not invade your

 2   privacy.  Just give a very broad answer, if you would.

 3              THE WITNESS:  Yes.  Endocrine issues.

 4   BY MR. GALIPO:

 5       Q.   Okay.  Were you taking some medication for that?

 6       A.   Yes.

 7       Q.   And, to your knowledge, did the medication affect

 8   you at all?  In other words, make you feel sleepy or anything

 9   like that?

10       A.   No.

11       Q.   Okay.  And to the best of your knowledge, did you

12   take your normal medication the day before the incident at

13   Costco and also the day of the incident?

14       A.   Yes.

15       Q.   And that particular Costco where this happened, had

16   you been there before the date of the incident?

17       A.   No.

18       Q.   Okay.  To your knowledge, was that the first day

19   that you had gone to that Costco?

20       A.   Yes.

21       Q.   And were you with your wife?

22       A.   Yes.

23       Q.   What is your wife's name?

24       A.   Rosemary.

25       Q.   And were you with your son?
```

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.
Salvador Sanchez on 03/10/2021                                        Page 21

1        A.    Yes.

2        Q.    How old was your son, approximately, at the time of

3     this incident?

4        A.    Approximately one year and a half.

5        Q.    Okay.  Now, you mentioned you did look at some

6     policies in preparation for the deposition; is that

7     correct?

8        A.    Yes.

9        Q.    And were those, as you understand it, LAPD

10    policies?

11       A.    Yes.

12       Q.    We have some policies that I'm going to try to show

13    on the screen.  We'll see how this works.

14             MR. GALIPO:  But I'm going to mark these as Exhibit

15    1.

16             (Exhibit 1 was marked for identification.)

17             MR. GALIPO:  And we're going to try to put them up

18    so everyone can see them.  So let's see how that goes, and

19    I'll ask if we can see them before I ask any questions about

20    them.

21             And my office will also at the conclusion of the

22    deposition e-mail all the exhibits to all the attorneys so

23    we have them.

24    BY MR. GALIPO:

25       Q.    Okay.  First of all, can you see this document on

```
 1   just read of that section of the policy?

 2       A.   Yes.

 3       Q.   And then if we can scroll down, there is a section

 4   240.05, Respect for constitutional rights.

 5            MR. GALIPO:  Are we able to scroll?

 6            Thank you.

 7   BY MR. GALIPO:

 8       Q.   I'm not going to read all of this, but was it

 9   generally your understanding as a police officer whether

10   on-duty or off-duty you should show respect for the

11   constitutional rights of others?

12       A.   Yes.

13       Q.   Okay.

14            MR. GALIPO:  Can we go to the next page.

15            MR. BRENTE:  Dale, this is Cory.  We should just

16   make clear that the sections you just read are from Volume 1

17   of the manual.  I think there is five volumes.  The section

18   you read is from Volume 1.

19            MR. GALIPO:  Okay.  Thank you, Cory.

20   BY MR. GALIPO:

21       Q.   And then there's a section 210.35, Conduct on

22   becoming an officer.

23            I'm not going to read that, but was that part of the

24   policy and part of your training as well?

25       A.   Yes.
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 34

1        Q.    And going to request No. 10, "Admit that you did a
2    walk-through at the scene with City investigators regarding
3    the incident."
4              You can see on Line 18 you admitted that; correct?
5        A.    Yes.
6        Q.    Do you recall generally when you did the
7    walk-through in relation to the incident?
8        A.    Yes.
9        Q.    When was it?  Was it the next day or within the
10   week?  What is your recollection?
11       A.    My recollection is it was the follow morning after I
12   was released from the hospital.
13       Q.    And is that when FID was doing their
14   investigation?
15       A.    You broke up.  Can you repeat the question --
16       Q.    I'm sorry.  Was FID, the Force Investigation
17   Division of the LAPD, doing that investigation?
18       A.    Yes.
19       Q.    So you would have went to the Costco with some of
20   the detectives from the LAPD?
21       A.    I do not recall, specifically, how I was transported
22   there, but yes, the LAPD FID detectives would have conducted
23   the walk-through.
24       Q.    Okay.  And at some point you recall being there for
25   the walk-through?

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.
Salvador Sanchez on 03/10/2021                                         Page 36

```
 1   California that the foregoing is true and correct.  Executed
 2   on February 4, 2021, at Riverside, California."
 3           And there is a signature at the bottom; is that your
 4   signature?
 5   A.   Yes.
 6   Q.   And did you understand when you signed this, you
 7   were verifying the responses that we just went through?
 8   A.   Yes.
 9   Q.   Okay.
10           MR. GALIPO:  Okay.  Thank you.
11   BY MR. GALIPO:
12   Q.   Okay.  So just some general questions about Costco,
13   and then we'll take a break because we've been going for a
14   while.
15           And, again, this is all before the incident started.
16           Do you have an estimate as to how long you were at
17   the Costco for, approximately, before the incident?
18   A.   I would estimate one hour before.
19   Q.   Okay.  And before you went to take those sausage
20   samples, before that.  So before you approached that booth
21   before any of this happened, you know -- do you recall
22   generally what you were shopping for?
23   A.   Yes.
24   Q.   What were you generally shopping for?
25   A.   Things we needed at the house, and I recall it was
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 42

1      Q.   Okay.  So before I asked you a few questions about

2  the incident, and I'm not sure if there will be objections or

3  not, but we'll find out.

4           But before I ask you about that, after the incident

5  did you initially go to the hospital?

6      A.   May you repeat that question, please.

7      Q.   Yeah.  That was a bad question.

8           At some point after you left Costco, did you end up

9  going to a hospital?

10     A.   Yes.

11     Q.   And what -- what hospital did you go to?

12     A.   I recall it being Corona Regional Medical Center.

13     Q.   Okay.  And do you know how long you were there,

14  approximately?

15     A.   I don't know exactly, but I would estimate six

16  hours.

17     Q.   While you were at the hospital, did you notice any

18  bleeding that you had?

19     A.   No.

20     Q.   Did you get any stitches?

21     A.   No.

22     Q.   Did any doctor indicate to you that you had any

23  bones broken or anything like that?

24     A.   No.

25     Q.   Have you ever seen -- and this is just a yes or no.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 43

1          Have you ever seen any video taken at Costco that

2     shows you in it, either on the news or elsewhere?

3          A.   Yes.

4          Q.   Okay.  And, again, this is a yes or no.

5          Have you ever listened to any recording of any kind

6     covering any of the events?

7          MR. FOX:  Dale, you mean separate and apart from any

8     videos he may have seen?

9          MR. GALIPO:  Correct.  Thank you.

10          THE WITNESS:  May you repeat that, Dana, please?

11    BY MR. GALIPO:

12         Q.   Sure.  Well, I think what Mr. Fox is saying, there

13    may have been some recordings attached to the videos you saw;

14    correct?

15         A.   Yes.

16         Q.   And I think what Dana was specifying is if I'm

17    talking about any recordings separate from that.

18          In other words, were the recordings that you heard

19    related to the incident in Costco, the ones that were

20    attached to the videos?

21         A.   Yes.

22         Q.   Okay.  Where did you go from the hospital?

23          Did you go home at some point?

24         A.   My recollection, to answer your first question,

25    where did I go after the hospital, my memory was that I went

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.
Salvador Sanchez on 03/10/2021                                    Page 44

```
1    back to the Costco.

2         Q.   Okay.

3         A.   I'm sorry.  I'm recalling that I went to the Corona

4    Police Station.

5         Q.   Okay.  And did you -- do you recall if you gave a

6    statement to any of the Corona police officers about what

7    occurred?

8              And that could just be a yes or no.

9         A.   I may -- I don't recall.  Can you elaborate that

10   question, please.

11        Q.   Sure.

12             MR. GALIPO:  It's like hailing over here.  I don't

13   know if you guys can hear it or not, but we have a total hail

14   storm.  I got to show you this.  This is unbelievable.  I

15   don't know if you can see --

16             (Simultaneous, overlapping colloquy.)

17             MR. FOX:  -- I thought Woodland Hills was known --

18   bad weather.  Wow.  You really can hear it.

19             MR. GALIPO:  All right.  Anyway.

20   BY MR. GALIPO:

21        Q.   Okay.  I think I asked you if you recall whether you

22   gave any statements to Corona about what had occurred.

23        A.   Yes.

24        Q.   And do you recall if you gave any statements about

25   what occurred before you got to the police station?
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 48

```
 1      A.    Yes.

 2      Q.    And then after that did you have any follow-up after

 3   that?

 4      A.    Yes.

 5      Q.    And what other follow-up did you have?

 6      A.    I went to see a neurologist, I believe, is a

 7   person's specialty, neurology.

 8      Q.    When did you go see that person, approximately?

 9      A.    I would estimate approximately in the fall of last

10   year.

11      Q.    And how many times have you seen that person?

12      A.    Once.

13      Q.    Do you know that person's name?

14      A.    Yes.

15      Q.    What is the person's name?

16      A.    His name is Daniel Franc, I believe is the

17   pronunciation, but it's spelled -- the last name is spelled,

18   F-r-a-n-c, like Charles.

19      Q.    And how did you find that particular person?

20      A.    He was recommended.

21      Q.    Was it recommended -- I don't want to know if it was

22   recommended by your lawyer, but was the recommendation by

23   anyone other than an attorney?

24            MR. FOX:  Well, I think that you can't -- you can't

25   answer that without answering it.
```

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.
Salvador Sanchez on 03/10/2021                                    Page 59

```
 1      A.   Yes.

 2      Q.   Which hospital was that?

 3      A.   As I recall, it was Corona Regional Medical Center,

 4  the day of the incident.

 5      Q.   Okay.  Thank you.

 6           And then you said you went to a hospital like within

 7  the week.

 8           Was that the same hospital or a different

 9  hospital?

10      A.   It's a different hospital.

11      Q.   What was the second one that you went to?

12      A.   The name of it?

13      Q.   Yes.  Thank you.

14      A.   I recall it being Little Company of Mary.

15      Q.   Okay.  And what city is that in?

16      A.   San Pedro.

17      Q.   Okay.  And the only other question I forgot to ask,

18  but do you remember when you were at the hospital on the day

19  of the incident and some Corona police officers tried to

20  interview you, you invoked your Fifth Amendment privilege at

21  that point?

22      A.   Yes --

23           MR. FOX:  He's just asking if you remember that,

24  Sal.

25           Just asking if you remember that.
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 60

1              Do you remember that?

2              THE WITNESS:  Yes.

3    BY MR. GALIPO:

4        Q.    Okay.  So I'm going to ask you some questions about

5    the incident now.

6              Did you fire your weapon during the incident?

7        A.    Mr. Galipo, I respectfully decline to answer the

8    question based upon my Fifth Amendment rights.

9        Q.    Did you ever see a gun in anyone's hand at any time

10   before you fired?

11       A.    Mr. Galipo, I will respectfully decline to answer

12   the question based upon my Fifth Amendment rights.

13       Q.    Did you give a warning to anyone that you were going

14   to fire?

15       A.    Mr. Galipo, I respectfully decline to answer the

16   question based upon my Fifth Amendment rights.

17       Q.    Did you shoot anyone in the back during the

18   incident?

19       A.    Mr. Galipo, I respectfully decline to answer the

20   question based upon my Fifth Amendment rights.

21       Q.    Was anyone in physical contact with you at the time

22   you fired?

23       A.    Mr. Galipo, I respectfully decline to answer your

24   question based upon my Fifth Amendment rights.

25       Q.    Did you ever strike Paola French during the

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
**Salvador Sanchez on 03/10/2021**                    Page 61

1   shooting?

2       A.    Mr. Galipo, I respectfully decline to answer your

3   question based upon my Fifth Amendment rights.

4       Q.    Did you ever strike Russell French during the

5   shooting?

6       A.    Mr. Galipo, I respectfully decline to answer your

7   question based upon my Fifth Amendment rights.

8       Q.    Did you ever strike Kenneth French during the

9   shooting?

10      A.    Mr. Galipo, I respectfully decline to answer your

11  question based upon my Fifth Amendment rights.

12      Q.    Would it be correct that any question I ask you

13  about the shooting incident itself today, you're going to

14  invoke your Fifth Amendment privilege and refuse to answer

15  that question?

16      A.    Yes.

17      Q.    Do you understand --

18            MR. GALIPO:  And you may want to weigh in on this,

19  Mr. Fox.

20  BY MR. GALIPO:

21      Q.    Do you understand that based on your refusal to

22  answer these questions under the Fifth Amendment, I could

23  potentially go to the judge and seek what is called an

24  adverse inference instruction to the jury that you decided to

25  invoke your Fifth Amendment privilege at the time of the

```
 1   not to answer questions during the deposition, and the judge

 2   will decide what impact, if any, that has on the trial.

 3       A.   I understand.

 4       Q.   Okay.

 5            MR. GALIPO:  Cory, I think I'm going to pass it to

 6   you for now.  I may have a few follow-up, but I'm

 7   anticipating you most likely have some questions for Salvador

 8   Sanchez.

 9            MR. BRENTE:  I do.  Thank you.

10                         EXAMINATION

11   BY MR. BRENTE:

12       Q.   Good morning, Mr. Sanchez.

13       A.   Good morning.

14       Q.   So on June 14, 2019, your work assignment, not on

15   that particular day, but in general, you wore working

16   Southwest patrol; correct?

17       A.   Yes.

18       Q.   And had you ever worked a plain clothes or

19   undercover assignment with the LAPD?

20       A.   No.

21       Q.   Were you familiar with a LAPD policies and

22   procedures as it relates to plain clothes or undercover

23   operations?

24       A.   No.

25       Q.   Now, on June 14, 2019, that was the day of the
```

```
 1   shooting at the Costco, true?

 2        A.   Yes.

 3        Q.   And do you remember what day of the week that was?

 4        A.   Yes.

 5        Q.   What day was it?

 6        A.   Friday.

 7        Q.   And that day you were on a day off, but you worked

 8   at an overtime cash detail for the Metropolitan

 9   Transportation Authority, true?

10        A.   Yes.

11        Q.   And the Los Angeles Police Department --

12             (Audio interruptions.)

13             MR. BRENTE:  Sorry.  We have three dogs, so --

14             MR. GALIPO:  Cory, I thought the dog was objecting

15   to your question.

16             MR. BRENTE:  He probably was.

17   BY MR. BRENTE:

18        Q.   The Los Angeles Police Department has a contract

19   with the Metropolitan Transportation Authority to provide

20   police services on certain bus and rail operations, true?

21        A.   Yes.

22        Q.   And officers from Los Angeles Police Department are

23   given the opportunity to go through the training and then

24   work cash overtime to provide security for Metropolitan

25   Transportation Authority, true?
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                        Page 65

```
 1        A.    Yes.

 2        Q.    And on June 14, 2019, do you remember what hours you

 3   worked on this Cash Overtime Detail for the Metropolitan

 4   Transportation Authority?

 5        A.    Yes.

 6        Q.    What were your hours that day?

 7        A.    From 5:00 in the morning to 2:00 p.m.

 8        Q.    And did you drive your personal vehicle to the work

 9   site for the MTA?

10        A.    Yes.

11        Q.    And did you then leave at the end of your shift and

12   drive your personal vehicle back to your residence?

13        A.    Yes.

14        Q.    And I don't want your address, but at the time of

15   the incident at Costco, in what city were you residing?

16        A.    In the city of Riverside.

17        Q.    And so do you remember about what time you arrived

18   home in your personal vehicle in the city of Riverside and to

19   the city of Riverside?

20        A.    No.

21        Q.    You got home sometime in the afternoon, true?

22        A.    Yes.

23        Q.    And when you arrived home were you wearing a police

24   uniform, or were you wearing civilian clothes?

25        A.    Police uniform.
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                          Page 66

1      Q.   And after you got home did you change into civilian

2    clothes?

3      A.   Yes.

4      Q.   And do you remember what time you went to Costco

5    with your wife and your son?

6      A.   No.  I don't recall.

7      Q.   Do you have an approximate time that you left to go

8    to Costco?

9      A.   Yes.

10     Q.   What is your approximate time, please.

11     A.   I would estimate between 5:30 and 6:30.

12     Q.   And when you drove to the Costco in Corona, were you

13   driving your personal vehicle or a vehicle owned by the city

14   of Los Angeles?

15     A.   My personal vehicle.

16     Q.   And when you drove to the Costco in the city of

17   Corona, what were you wearing?

18     A.   I recall it was a polo shirt, shorts, and tennis

19   shoes.

20     Q.   Was there anything -- any logos on the polo shirt?

21     A.   No.

22     Q.   Was there any logos on the outside of the shorts

23   that would be visible?

24     A.   I don't recall.

25     Q.   And were your tennis shoes a particular brand?

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
**Salvador Sanchez on 03/10/2021**                                            Page 67

1      A.    No.  I don't recall.

2      Q.    Did any of your clothing have any markings that

3   would identify you as a police officer?

4      A.    I recall I also wore a watch, a wrist watch.

5      Q.    Okay.  We'll put the watch aside for a second.

6            Other than your watch was there anything on any of

7   your clothing, any markings on -- or any -- anything is

8   affixed to your clothing when you went to Costco that would

9   identify you as a police officer?

10     A.    No.

11     Q.    Now, the watch, what kind of watch was that?

12     A.    Garmin.

13     Q.    And did it have some logo or some indication of

14   support from law enforcement?

15     A.    Yes.

16     Q.    And what was that?

17     A.    It was a thin blue line flag.

18     Q.    Was that watch provided to you by the Los Angeles

19   Police Department?

20     A.    Yes.

21     Q.    The LAPD purchased that watch and gave it to you?

22     A.    Yes.

23     Q.    And who gave it to you?

24     A.    I don't recall who specifically, but it was given to

25   me by LAPD personnel.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                              Page 68

1      Q.    Okay.  I just want to make sure I'm clear on this.

2            Are you saying another employee gave it to you?

3      A.    That -- yes.  I am saying that.

4      Q.    Okay.  As a Los Angeles police officer you have

5      certain equipment that's issued to you by the LAPD, true?

6      A.    Yes.

7      Q.    And that property that is issued to you, you

8      understand is the property of the City of Los Angeles,

9      true?

10     A.    Yes.

11     Q.    So, for example, when you graduated from the

12     academy, you were provided with the duty holster for patrol,

13     true?

14     A.    Yes.

15     Q.    And you understood that was the property of the City

16     of Los Angeles, true?

17     A.    Yes.

18     Q.    And if you were to leave the employment of the City

19     of Los Angeles, you would have to either surrender that

20     holster, or I think there might be an arrangement where you

21     can purchase it from the City, true?

22     A.    Yes.

23     Q.    Is it your testimony that watch was the property of

24     the City of Los Angeles?

25     A.    No.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    **Page 69**

1      Q.   So it was a gift to you by another City employee?

2      A.   Yes.

3      Q.   A co-worker?

4      A.   I believe it would have been a supervisor of some

5   type.

6      Q.   You don't remember who gave you that watch?

7      A.   That's right.

8      Q.   Okay.  Now, the city of Los Angeles is in the county

9   of Los Angeles, true?

10     A.   Yes.

11     Q.   And the Costco you were at was in the city of

12   Corona, true?

13     A.   True.

14     Q.   And the city of Corona is in the county of

15   Riverside, true?

16     A.   Yes.

17     Q.   When you went into the Costco on June 14, 2019, were

18   you -- did you have any badge affixed to your person that

19   would be visible to other persons?

20     A.   No.

21     Q.   When you went into the Costco on June 14, 2019, did

22   you have any identification card that would put to your body

23   out in the open to be viewed by others?

24     A.   No.

25     Q.   You had a gun with you that day?

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                           Page 70

1      A.    Yes.

2      Q.    And what kind of gun was that?

3      A.    A Glock Model 26.

4      Q.    And did you purchase that gun?

5      A.    Yes.

6      Q.    With your own money?

7      A.    Yes.

8      Q.    When you graduated from the Los Angeles Police

9   Department Academy, did you then have a service pistol that

10   was issued to you by the Los Angeles Police Department and

11   which you understood to be owned by the city of Los

12   Angeles?

13      A.    Yes.

14      Q.    What model gun was that?

15      A.    A Glock 17.

16      Q.    Now, the Glock Model 26 that you had with you in

17   Costco on June 14, 2019, could that gun be carried by you as

18   your primary duty weapon as an officer working a uniform

19   assignment for the Los Angeles Police Department?

20      A.    No.

21      Q.    Now, every gun that a Los Angeles Police Department

22   officer wishes to carry off-duty, are they required to

23   register that firearm with the department armorer?

24      A.    Can you repeat that question again, please.

25      Q.    Yes.  For any gun that a Los Angeles police officer

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
**Salvador Sanchez on 03/10/2021**                                    **Page 71**

1   wants to carry off-duty, are they required to register that

2   gun with the department armorer?

3        A.   Yes.

4        Q.   And the Glock, the Glock Model 26 that you had, was

5   that on your gun card with the armorer?

6        A.   Yes.

7        Q.   The Los Angeles Police Department does not require

8   officers to carry guns off-duty, true?

9        A.   I don't know.

10       Q.   Can you tell me of any policy or procedure that

11   requires a Los Angeles police officer to carry a gun

12   off-duty?

13       A.   I am not aware of one that requires that.

14       Q.   However, if a Los Angeles police officer chooses to

15   carry a gun off-duty and it's registered with the department

16   armorer, they're authorized to carry that gun, true?

17       A.   Yes.

18       Q.   Is that yes?

19       A.   Yes, it is.

20       Q.   You had a -- that Glock Model 26, was it being

21   carried in a holster?

22       A.   Yes.

23       Q.   And was that holster an inside-the-waist band

24   holster?

25       A.   Yes.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                Page 72

1      Q.    Did you have your polo shirt covering your pistol?

2      A.    Yes.

3      Q.    If you were walking around in Costco on the day of

4   this incident, to your knowledge, can anybody see that you

5   were carrying a concealed firearm?

6           MR. FOX:  I'll object.  It calls for speculation.

7           You may still answer the question, Sal.

8           THE WITNESS:  May you repeat the question.

9   BY MR. BRENTE:

10          Q.    When you were walking around at Costco that day, to

11   your knowledge, was your pistol concealed from view of the

12   people in the Costco?

13          A.    Yes.

14          Q.    And was that holster issued to you by the city of

15   Los Angeles, or did you purchase it with your own money?

16          A.    I purchased it with my own money.

17          Q.    And in contrast, you did have a duty holster that

18   was issued to you by the city of Los Angeles, true?

19          A.    Yes.

20          Q.    And that was for carrying your service pistol when

21   you were working in the uniformed assignment, true?

22          A.    Yes.

23          Q.    So --

24          MR. FOX:  I'm sorry, Cory.  We're just getting huge

25   thunder claps here now.  The skies are falling in, everybody.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

1    to do extra shooting on the range, officers can buy their own

2    ammunition, true?

3         A.    Yes.

4         Q.    But when you're on-duty on uniformed assignment, the

5    ammunition carried in the pistol when on-duty is to be

6    ammunition issued to the officer by the LAPD, true?

7         A.    Yes.

8         Q.    Is that yes?

9         A.    Yes.

10        Q.    Was this Speer ammunition that you had in your gun

11   issues to you by the LAPD for you in your 9 millimeter Glock

12   26 that you personally owned?

13        A.    No.

14        Q.    Did you -- was that Speer ammunition, was that

15   ammunition that was issued to you by the Los Angeles Police

16   Department for use in your service pistol?

17        A.    Yes.

18        Q.    And did you then take the ammunition that was issued

19   to by the LAPD for use in your service pistol and put it in

20   your personally-owned Glock Model 26?

21        A.    May you repeat that question, please.

22        Q.    Did you take the Speer ammunition that was issued to

23   you by the Los Angeles Police Department for use in your

24   service pistol and put it in your personally-owned Glock

25   Model 26?

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
**Salvador Sanchez on 03/10/2021**                          Page 75

1      A.    I don't recall.

2      Q.    Is there any policy or procedure about Los Angeles

3   police officers using duty ammunition issued by the City in

4   their own personally-owned firearm?

5      A.    Yes.

6      Q.    What was the policy?

7      A.    My understanding is that the ammunition to be

8   carried with it to be personally-owned firearm that I would

9   carry as authorized by LAPD shall be the same authorized

10  ammunition as would be applicable to my service weapon.

11     Q.    And is that ammunition that you're supposed to

12  purchase on your own?

13     A.    I'm not sure of your question.

14     Q.    Well, were you carrying this Glock Model 26

15  generally as a backup weapon when you were on-duty in

16  uniformed assignment?

17     A.    Yes, I have.

18     Q.    Okay.  And are officers required to carry a backup

19  weapon when working in uniformed assignment?

20     A.    Yes.

21     Q.    Can you tell me which policy or procedure the Los

22  Angeles Police Department requires a Los Angeles police

23  officer to carry a backup gun when working in uniformed

24  assignment?

25     A.    I don't know specifically which policy dictates

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 77

 1   for use in the weapons carried by a Los Angeles police

 2   officer, and I have authority by the City and the Department

 3   to purchase law enforcement specific ammunition that I can

 4   utilize into those weapons.

 5       Q.   Okay.  But I just want to -- and I appreciate your

 6   answer.  Thank you.

 7            I just want to be clear that your testimony is that

 8   if the Los Angeles police officer, if you want to carry a

 9   backup weapon that you personally own, the City is required

10   to provide you with ammunition for that backup weapon?

11       A.   No.  I'm not -- I'm not certain that that is --

12   what -- what the policy would state.

13       Q.   But your testimony is that the bullets that were in

14   the Glock 26 on the day of the shooting were bullets

15   purchased and issued to you for use in your backup weapon by

16   the city of Los Angeles, true?

17       A.   As I recall, it is a possibility that the

18   ammunitions that were issued to me were inputted into that

19   weapon.

20       Q.   Okay.  But that's not my question.

21            My question is, is it your testimony that the

22   bullets that were in your Glock 26 that you had in the Costco

23   were issued to you by the LAPD for the purpose of being used

24   in your backup weapon?

25       A.   I don't know.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                                Page 78

```
 1        Q.    The day that you were in Costco, did you have a
 2    police badge on your person anywhere, whether in your pocket,
 3    on your belt, a police badge?
 4        A.    No.
 5        Q.    What form of police identification did you have
 6    anywhere on your person, whether in a wallet or anywhere
 7    else?
 8        A.    I had my LAPD-issued ID that was in my wallet.
 9        Q.    And that's a plastic card that has your photograph
10    on it.  It says LAPD on it and has your name, your serial
11    number, true?
12        A.    Yes.
13        Q.    And it's also used -- it's magnetic to open doors in
14    the station, either pulling into the gate at the parking lot
15    or going into the back of the station or certain doors within
16    the station.  That's a key reader, true?
17        A.    Yes.
18        Q.    On June 14, 2019, before you fired your gun, did you
19    ever identify yourself as a police officer?
20            MR. FOX:  So we're in the same grounds now, Cory,
21    that we were with Dale's questions, but I think Dale already
22    asked that question, and Sal invoked his Fifth Amendment
23    rights.  So I'll interpose my objection.
24            But Sal can answer it the way he answered Mr.
25    Galipo's questions.  Go ahead, Sal.
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 79

 1            THE WITNESS:  Sir, I will respectfully decline to

 2    answer your question based upon my Fifth Amendment rights.

 3            MR. BRENTE:  Okay.  So and I appreciate that, Mr.

 4    Sanchez.

 5            So because we're creating a record, so -- and I

 6    think there is a few things you can do.

 7            One of that strike all of his testimony or move to

 8    strike it, of course, it's not my decision.  It's the

 9    Court's, about course and scope, cover and law, cover and

10    law, official capacity, all of the questions that Mr. Galipo

11    asked Mr. Sanchez based on his responses to discovery because

12    I don't believe any party gets to elicit testimony that

13    suggest that the witness, in this case Mr. Sanchez, was

14    on-duty which is one question that was asked based on his

15    discovery responses acting in the course and scope of his

16    employment and in his official capacity as a Los Angeles

17    police officer.  But then at the same time refuse to answer

18    questions that probe and explore those conclusions.

19            So I want all counsel to take -- keep that in mind,

20    and I don't know Mr. Fox, if you want to have a conversation

21    with your client, but -- and I don't think you get to have it

22    both ways.  I don't think you get to have him answer

23    questions that some might say go into an ultimate issue:

24    Yes, I was on duty.  Yes, I was acting in course and scope of

25    my employment.  Yes, I was acting in my official capacity as

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                        **Page 83**

1    the deposition because if he had, I would have thought about

2    it, and said, you know what, you're right.  Let me confer

3    with my client.

4            So I was only doing it in a way that was trying to

5    shorten things, but I appreciate your position, and I'll move

6    forward.

7            MR. FOX:  Thank you.

8    BY MR. BRENTE:

9        Q.    Mr. Sanchez, as you were walking around the Costco

10   before the officer-involved shooting, the shooting that you

11   got involved in, did you ever tell anyone that you worked for

12   the Los Angeles Police Department?

13       A.    No.

14       Q.    And prior to the shooting had you had any contact or

15   any interaction with Kenneth French, the person you now know

16   to be Kenneth French?

17       A.    No.

18       Q.    And prior to the shooting had you had any contact or

19   interaction with the person you now know to be Paola

20   French?

21       A.    No.

22       Q.    And prior to the shooting had you had any contact or

23   interaction with the person you now know to be Russell

24   French?

25       A.    No.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    **Page 84**

1       Q.   And as you sit here today, knowing their identities,

2    that is Kenneth French, Paola French, and Russell French, are

3    you of the opinion that you actually had some contact with

4    them prior to that day in your capacity of Los Angeles police

5    officer?

6       A.   May you repeat that question, please, again.

7       Q.   Sure.  And let me break it up a little bit.

8            What I'm trying to find out is, as you sit here

9    today, based on everything you know today, is it your

10   position that, you know, now that I know what I know today,

11   that guy Kenneth French, I arrested that guy, you know, six

12   months or a year before and when I was working as an LAPD

13   officer.  So I actually did know that guy.

14           Is that your position?

15      A.   I understand the question -- I'm sorry.

16           I understand the context, but can you repeat the

17   question?

18      Q.   Okay.  And thank you.  Sure.

19           So based on everything you know today, as you sit

20   here for your deposition, do you believe you had any prior

21   contact or interaction, ever, with Kenneth French?

22      A.   No.

23      Q.   And based on everything you know today, as you sit

24   here through your deposition, do you believe you had any

25   prior contact or interaction at any time with Paola French?

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 85

```
 1      A.    No.

 2      Q.    And as you sit here for your deposition today, and

 3   based on everything you know today, do you believe that you

 4   ever had any contact or interaction at any time with Russell

 5   French?

 6      A.    No.

 7      Q.    The Glock Model 26 that you were carrying, how many

 8   bullets were in that gun when you walked into the Costco?

 9      A.    A total of 13.

10      Q.    Did you have an extended magazine in that pistol?

11      A.    Yes.

12      Q.    And what was the capacity of the standard magazine

13   for that pistol?

14      A.    California compliance magazines are ten rounds.

15      Q.    And the extended -- the extended capacity magazine

16   that you had in that pistol, was that purchased and issued to

17   you by the City of Los Angeles, or did you purchase that with

18   your own money?

19      A.    I purchased that with my own money.

20      Q.    And that was your property?

21      A.    Yes.

22      Q.    How many shots did you fire inside the Costco on

23   June 14, 2019?

24            MR. FOX:  So we're going to the same ground, Cory.

25   I assumed you knew that.  So I'm going to give him
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                          Page 86

```
 1   the same instruction.

 2           But, Sal, you can give the same response, please.

 3           THE WITNESS:  Sir, I respectfully decline to answer

 4   your question based upon my Fifth Amendment rights.

 5   BY MR. BRENTE:

 6       Q.   I appreciate that.  And for clarity, this is -- a

 7   Fifth Amendment, as lawyers know has a number of clauses in

 8   it.  And you're specifically invoking your Fifth Amendment

 9   right against self-incrimination, true?

10       A.   Yes.

11       Q.   As a Los Angeles police officer were you trained

12   that you should identify yourself as a police officer before

13   using force?

14       A.   Yes.  When feasible.

15       Q.   Did you identify yourself as a Los Angeles police

16   officer before using force on June 14, 2019?

17           MR. FOX:  So, Cory, it will be the same objection

18   and the same instruction because it deals with the specifics

19   of the shooting.

20           Sal, you can go ahead and give your response.

21           THE WITNESS:  Sir, I respectfully decline to answer

22   your question based upon my Fifth Amendment rights.

23   BY MR. BRENTE:

24       Q.   And as a Los Angeles police officer were you trained

25   that before using force, you should try and give the person
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 87

1    commands?

2        A.    Yes --

3              MR. FOX:  I'm going to object.  That's vague and

4    ambiguous.

5              But go ahead.

6    BY MR. BRENTE:

7        Q.    And did you give any commands to Kenneth French

8    prior to firing your pistol on June 14, 2019?

9              MR. FOX:  I'll object to the question on Fifth

10   Amendment grounds.

11             Sal, you should -- you can still answer the question

12   accordingly.

13             THE WITNESS:  Sir, I decline to answer your question

14   based upon my Fifth Amendment rights.

15   BY MR. BRENTE:

16       Q.    And just to complete the record, I asked you about

17   Kenneth French.

18             Did you give any commands to Paola French or Russell

19   French prior to firing your pistol in the Costco on June 14,

20   2019?

21             MR. FOX:  Same objection, same instruction.

22             Go ahead, Sal.  Go ahead.

23             THE WITNESS:  Sir, I respectfully decline to answer

24   your question based upon my Fifth Amendment rights.

25   BY MR. BRENTE:

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                            Page 88

1      Q.   As a Los Angeles police officer were you trained

2   that you should try to give the person a warning before using

3   deadly force?

4      A.   Yes.  When feasible --

5           MR. FOX:  You can answer the -- go ahead, Sal.

6           You can answer.

7           Did you get that, Madam Court Reporter?  I

8   apologize.

9           COURT REPORTER:  Yes, I got it.  Thank you.

10          MR. FOX:  Thank you.

11  BY MR. BRENTE:

12     Q.   Prior to using deadly force at Costco on June 14,

13  2019, did you give any person a warning?

14          MR. FOX:  I object to your question on Fifth

15  Amendment grounds, and the same instruction.

16          Sal, go ahead.

17          THE WITNESS:  Sir, I respectfully decline to answer

18  your question based upon my Fifth Amendment rights.

19  BY MR. BRENTE:

20     Q.   Prior to the officer -- excuse me.

21          Prior to the shooting on June 14, 2019, did the

22  person you now know to be Kenneth French say anything to

23  you?

24          MR. FOX:  Same objection, same instruction.

25          Go ahead, Sal.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 89

1        THE WITNESS:  Sir, I respectfully decline to answer

2   your question based upon my Fifth Amendment rights.

3   BY MR. BRENTE:

4     Q.   Prior to the shooting on June 14, 2019, did anyone

5   make a statement to the effect of and directed to, "I know

6   you're a cop?"

7        MR. FOX:  Same objection, same instruction.

8        Go ahead, Sal.

9        THE WITNESS:  Sir, I respectfully decline to answer

10  your question based upon my Fifth Amendment rights.

11  BY MR. BRENTE:

12     Q.   Prior to the shooting did Kenneth French or anyone

13  else say or do anything to suggest that they knew you were a

14  Los Angeles police officer?

15       MR. FOX:  I will impose the same objection and the

16  same instruction.

17       But Sal, you should go ahead and give your answer.

18       THE WITNESS:  Sir, I respectfully decline to answer

19  your question based upon my Fifth Amendment rights.

20  BY MR. BRENTE:

21     Q.   At the time you went to the Costco on June 14, 2019,

22  were on-duty or off-duty?

23     A.   I was off-duty.

24     Q.   On your own personal time, true?

25     A.   Yes.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                              Page 90

1    Q.    As a Los Angeles police officer, did you ever

2    provide patrol services in the city of Corona?

3    A.    No.

4    Q.    As a Los Angeles police officer, did you ever

5    provide patrol or police services in the county of

6    Riverside?

7    A.    No.

8    Q.    And at any time -- strike that.

9          I think you told Mr. Galipo that if I got this

10   wrong, I'm sure you or your lawyer will correct me.

11         Have you seen any body-worn video that was taken by

12   any Corona police officers?

13   A.    Yes.

14   Q.    And did you speak to an officer, a Corona police

15   officer you now know whose last name is Slane, S-l-a-n-e?

16   A.    Yes.

17   Q.    And was he the first uniformed Corona police officer

18   you spoke to after the shooting on June 14, 2019?

19   A.    I don't recall, specifically.

20   Q.    Did you tell Officer Slane, "Hey, I'm off-duty.

21   That guy just shot me.  He has a gun?"

22   A.    I don't recall specifically if that was stated to

23   him.  If that's was stated to him.

24   Q.    Do you believe you made that statement to a

25   uniformed responding police officer?

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.
Salvador Sanchez on 03/10/2021                                   Page 91

```
 1     A.   Yes.

 2          MR. FOX:  Hey, Cory, I apologize for interrupting.

 3          Can we go off the record a moment to discuss

 4   scheduling for a second?

 5          MR. BRENTE:  Of course.

 6          THE VIDEOGRAPHER:  We're off the record at 12:29.

 7          (Discussion held off the record.)

 8          (Whereupon lunch recess was taken.)

 9          THE VIDEOGRAPHER:  We're back on the record at 2:35.

10   BY MR. BRENTE:

11     Q.   All right.  Thank you.

12          Good afternoon, Mr. Sanchez.

13     A.   Good afternoon, Mr. Brente.

14     Q.   At some point did you remove your wallet from your

15   pants pocket and from within your wallet produce your LAPD

16   identification card and show it to Officer Slane?

17     A.   Yes.

18     Q.   Now, Mr. Galipo asked you about an LAPD manual

19   section -- or, actually, more than one, but one of the ones

20   he asked you about was from Volume 1, and it was manual

21   section 230.10 which is titled "Responsibility of off-duty

22   officers."

23          Do you remember him asking you some questions about

24   that?

25     A.   Yes.
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                                    Page 92

1      Q.   And he read, I think, in total a series of questions

2  all of that 230.102.

3           Do you remember that?

4      A.   Yes.

5      Q.   And I think you also said that this was one of the

6  sections from the LAPD manual that you reviewed in

7  preparation for your deposition; correct?

8      A.   Yes.

9      Q.   Okay.  So let me ask you some questions about it.

10          As Mr. Galipo read, the beginning of manual section

11  230.10 from Volume 1 says (reading):

12          "Under California law, both on-and off-duty officers

13  have peace officer authority as to any public offense

14  committed to which there is probable cause to believe has

15  been committed in his presence."

16          That's part of that, not all of it.

17          So what public offense was being committed when

18  you --

19          MR. FOX:  So I'm --

20          MR. BRENTE:  -- took action?

21          MR. FOX:  Sorry, Cory.  Yeah, so this is going to

22  engender the same objection by me on Fifth Amendment grounds

23  and same instruction.

24          Sal, can you go ahead and please answer the

25  question.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 93

1          THE WITNESS:  Yes.  Mr. Brente, I will respectfully

2   decline to answer your question based upon my Fifth Amendment

3   rights.

4   BY MR. BRENTE:

5       Q.   And the section goes on to say and in contrast there

6   is either some public offense that was committed, or there is

7   no alternative which is probable cause to believe that an

8   offense has been committed.

9           Did you have probable cause to believe that a public

10  offense had been committed prior to use of force?

11          MR. FOX:  Same objection, same instruction.

12          THE WITNESS:  Mr. Brente, I respectfully decline to

13  answer your question based upon my Fifth Amendment rights.

14  BY MR. BRENTE:

15      Q.   And the section goes on to discuss the -- whether

16  it's a public offense and probable cause to believe that

17  there was a public offense in the officer's presence and with

18  respect to which there is an immediate danger to person or

19  property.

20          What immediate danger to person or property do you

21  contend was taking place that authorized your use of deadly

22  force?

23          MR. FOX:  I'll object on the grounds it seeks to

24  interfere with his Fifth Amendment rights.

25          Sal, you can respond.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                          Page 94

1          THE WITNESS:  Mr. Brente, I respectfully decline to

2     answer your question based upon my Fifth Amendment rights.

3     BY MR. BRENTE:

4          Q.   And the manual section goes on to say that off-duty

5     officers, both inside and outside the city limits are to give

6     first consideration to causing the appropriate action to be

7     affected by the responsible law enforcement agency, true?

8          MR. FOX:  You're asking is it true what it says?

9          MR. BRENTE:  Correct.

10         MR. FOX:  Yeah.  You can answer --

11         THE WITNESS:  May you repeat that, and if for

12    review.  So I can read along with you.  Mr. Galipo can

13    actually put the manual section up on the screen again so I

14    can follow with you, please.

15         MR. BRENTE:  Sure.  Mr. Galipo, do you have that

16    ability?

17         MR. FOX:  I know Dale doesn't, but someone in his

18    office might.

19         MR. GALIPO:  That's exactly right.  You know me very

20    well in that regard.

21         So, Cory, is this the same one that I read from

22    earlier?

23         MR. BRENTE:  Yes.

24         MR. GALIPO:  Okay.  I think it was Exhibit 1.

25         If Renee can put that up and then we can get to the

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

```
 1    two, three, four sentences, there is a part of it that says,

 2    "Off-duty officers both inside and outside the city limits

 3    are to give first consideration to causing the appropriate

 4    action to be affected by the responsible law enforcement

 5    agency."

 6              Do you see that part?

 7    A.    Yes.

 8    Q.    And you were aware of that before June 14, 2019,

 9    true?

10    A.    Yes.

11    Q.    And you were trained that -- that unless presented

12    with no other option, being a good witness may be off-duty

13    officer's best course of action, true?

14    A.    May you repeat that one last time, sir.

15    Q.    You're trained by the Los Angeles Police Department

16    that unless presented with no other option, being a good

17    witness may be the off-duty officer's best course of

18    action?

19    A.    Can you clarify that question for me, please.

20    Q.    Well, so within the Los Angeles Police Department,

21    you get training from a variety of documents, true?

22    A.    Yes.

23    Q.    And that there is the department manual which we're

24    looking at on the screen, true?

25    A.    Yes, yes.
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                                    Page 97

```
 1      Q.   And there are training bulletins, true?

 2      A.   Yes.

 3      Q.   Training directives, true?

 4      A.   Yes.

 5      Q.   Special orders, true?

 6      A.   Yes.

 7      Q.   As a Los Angeles Police Department officer, you're

 8   required to either physically or electronically sign for

 9   training bulletins, training directives, and other policies

10   and to know them, true?

11      A.   Yes.

12      Q.   So here's my question:  You were trained that unless

13   presented with no other option, being a good witness may be

14   the off-duty officer's best course of action, true?

15           MR. GALIPO:  Objection.  Vague and ambiguous and

16   incomplete hypothetical.

17   BY MR. BRENTE:

18      Q.   You can answer, Mr. Sanchez.

19      A.   Mr. Brente, respectfully, that -- that is a bit

20   confusing to me.  It's in the wording that you're describing,

21   no option available.

22      Q.   Well --

23           MR. FOX:  And, Cory, I know you're not required to,

24   but if you're reading something, you want to show it to him

25   and ask him.  That'd be fine.  I know you're not required to,
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 101

```
 1            THE WITNESS:  Mr. Brente, can you repeat the

 2    question, please.

 3    BY MR. BRENTE:

 4        Q.   Is it the overall philosophy that you were trained

 5    in as an LAPD officer when off-duty, that the best course of

 6    action for you is to -- for any off-duty Los Angeles police

 7    officer to try to be a good witness and call for service to

 8    whatever responsible agency it is, whether it's LAPD, LA

 9    Sheriff's, whatever area you're in?

10            MR. GALIPO:  Objection.  Vague and ambiguous as

11    phrased and incomplete hypothetical.  Depends on the

12    circumstances.

13            MR. FOX:  I'll join with the ambiguous objection.

14            MR. BRENTE:  Is that you making all those

15    objections, Dale?

16            MR. GALIPO:  Yeah.  I got to do something to stay

17    awake here.

18            MR. BRENTE:  Oh -- I was going -- I didn't know

19    whose lawyer -- Mr. Sanchez -- okay.  Well, it's good to hear

20    your voice.

21    BY MR. BRENTE:

22        Q.   Go ahead, Mr. Sanchez.

23        A.   Yes.

24        Q.   Thank you.  Were you also instructed as a Los

25    Angeles police officer as it relates to off duty actions,
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                                    Page 102

1    that officer should consider the safety risks involved to

2    themselves and to others before taking any peace officer

3    action while off-duty?

4         A.    Yes.

5         Q.    And were you also instructed that when off-duty,

6    officers need to seriously consider the potential danger to

7    themselves and family members or friends who may be with them

8    at the time?

9         A.    Yes.

10        Q.    And were you also instructed as an LAPD officer that

11   when off-duty, it is best that you not wear or do anything

12   that would readily identify you as a peace officer?

13             MR. GALIPO:  Objection.  Vague and ambiguous.

14             Depends on the circumstances.

15   BY MR. BRENTE:

16        Q.    Go ahead, Mr. Sanchez.

17        A.    I don't recall the policy explicitly stating that.

18        Q.    Do you remember it saying things like when you're

19   off-duty, you don't want people to be able to identify you as

20   a peace officer so you should avoid wear things like clothing

21   that depicts peace officer employment, police equipment

22   that's not concealed, personalized license plates or license

23   frames that indicate peace officer activities or status,

24   peace officer on personal vehicles, things like that?

25        A.    I don't recall the policy stating that.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                              **Page 103**

1      Q.    The day that you went to Costco, you weren't wearing

2   anything that readily identified you as a police officer,

3   true?

4      A.    Other than what we discussed pertaining to the

5   watch, no.  There is no other insignias that would have

6   associated me as a law enforcement officer.

7      Q.    Let me just ask you another question about this

8   watch.

9            Was this the watch that anyone could buy in the

10   public, or do you have to be a police officer to purchase

11   that watch?

12      A.    Anyone from the public can purchase that watch.

13      Q.    Typically, the Blue Lives Matter flag is something

14   that members of the public might wear or display to show

15   support for law enforcement, true?

16      A.    I would agree with that statement.

17      Q.    And you were also instructed that if you were

18   involved in use of force off-duty; that your actions would be

19   judged by the same standards of an on-duty force, true?

20      A.    To my recollection, yes.

21      Q.    Okay.  Going back to -- the incident on June 14,

22   2019, true?

23      A.    True.

24      Q.    When before that did you last have any training, and

25   that would include roll call training on off-duty actions and

1    then an off-duty responsibilities?

2        A.    I recall roll call training regarding off-duty

3    actions few days prior to the incident.

4        Q.    And was that training done at Southwest by a

5    Lieutenant Merlo, M-e-r-l-o?

6        A.    Yes.

7        Q.    And in that roll call training, were you and the

8    other officers in roll call reminded that an officer's best

9    course of action when off-duty is to be a good witness and

10    notify the responsible law enforcement agency?

11            MR. GALIPO:  Objection.  Vague and ambiguous.

12            Depends on the facts --

13            MR. FOX:  I will also object.  It assumes facts.

14            Go ahead, Sal.

15    BY MR. BRENTE:

16        Q.    You can answer.

17        A.    As part of the overall off-duty action, it is

18    possible it might have been included.  I do not recall

19    specifically if that, indeed, was in the context that you put

20    it in.

21        Q.    Thank you.  There is nothing in LAPD policy that

22    requires you to take any police action when off-duty, true?

23            MR. GALIPO:  Objection.  Calls for speculation and

24    vague and ambiguous as phrased.

25    BY MR. BRENTE:

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                     **Page 106**

1    action when you're off-duty?

2           MR. GALIPO:  Objection.  Vague and ambiguous.

3    BY MR. BRENTE:

4       Q.   You can answer.

5       A.   I'm not sure if there is.

6       Q.   Well, so you're saying you don't know one way or the

7    other?

8       A.   If there is an LAPD policy that requires for me to

9    take action while off-duty, I'm not sure if it is a policy

10   that explicitly requires for me to take action.

11      Q.   Okay.  Thank you.

12           Now, the use of force that you were involved in and

13   that was adjudicated by the Los Angeles Police Department

14   because you are a Department employee or were a Department

15   employee, true?

16           MR. GALIPO:  Objection.  Calls for speculation as to

17   why.

18   BY MR. BRENTE:

19      Q.   You can answer.

20      A.   Yes.

21      Q.   And your shooting was reviewed by among others the

22   Los Angeles Police Department's Use-of-Force Review Board,

23   true?

24      A.   Did you say reviewed or refuted, r-e-f-u-t-e-d?

25      Q.   Reviewed, r-e-v-i-e-w-e-d.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 107

```
 1        A.    Yes.
 2        Q.    And the Use-of-Force Review Board reviewed your
 3    tactics, true?
 4        A.    Yes.
 5        Q.    And the two possible findings are administrative
 6    approval and administrative disapproval, true?
 7        A.    Yes.
 8        Q.    And your tactics were administratively disapproved
 9    by the Use-of-Force Review Board, true?
10              MR. FOX:  So, Cory, I'm going to object the line of
11    questioning regarding the Review Board, the Review Board
12    finding, the Review Board conclusions for reasons which I
13    believe you know, including it wouldn't be relevant.  It
14    would not be usable at this trial.
15              I recognize it's your discovery deposition.  So I'm
16    not going instruct him not to answer the question, but may I
17    have a running objection to this line of questioning on all
18    appropriate grounds?
19              MR. BRENTE:  Sure.
20              MR. FOX:  Thanks.
21              Go ahead, Sal.  You can answer the question.
22              Do you remember it?
23              THE WITNESS:  May you repeat it, Mr. Brente.
24    BY MR. BRENTE:
25        Q.    Sure.  Your tactics were determined by the Use-of-
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                     Page 108

1    Force Review Board to merit a finding of administrative

2    disapproval, true?

3         A.   Yes.

4         Q.   And the Use-of-Force Review Board also evaluated

5    your compliance with LAPD's policy on drawing and exhibiting

6    a firearm, true?

7         A.   Yes.

8         Q.   And the Use-of-Force Review Board finding on your

9    compliance with drawing and exhibiting a firearm was that you

10   were out of policy, true?

11        A.   Yes.

12        Q.   And Use-of-Force Review Board also evaluated your

13   lethal use of force as to whether or not it was within

14   compliance with LAPD policy, true?

15        A.   Yes.

16        Q.   And the Use-of-Force Review Board determined that

17   your use of deadly force was out of policy, true?

18        A.   Yes.

19        Q.   And the chief of police made his findings and

20   recommendations on tactics as well, true?

21        A.   Yes.

22        Q.   And the chief of police concluded that your tactics

23   merited a finding of administrative disapproval, true?

24        A.   Yes.

25        Q.   And the chief of police also evaluated your

 1   compliance with LAPD policy on drawing and exhibiting a

 2   firearm, true?

 3       A.   Yes.

 4       Q.   And the chief determined that your drawing and

 5   exhibiting of a firearm was out of policy, true?

 6       A.   Yes.

 7       Q.   And the chief also evaluated your use of deadly

 8   force in the context of LAPD policy, true?

 9       A.   Yes.

10       Q.   And the chief determined that your use of deadly

11   force was out of policy, true?

12       A.   Yes.

13       Q.   And the office of the Los Angeles Police Department

14   Inspector General also reviewed your actions as well, true?

15       A.   Yes.

16       Q.   And as it relates to tactics, the office of the

17   Inspector General recommended a finding of administrative

18   disapproval, true?

19       A.   That, I'm not sure if they actually have the ability

20   to weigh in on the outcome of the decision.  I understood

21   they reviewed.  I just don't know if they had anything to do

22   with the decision.

23       Q.   Okay.  That's fair.

24            Is it your understanding as a Los Angeles police

25   officer just as it relates to the way the organization works

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    **Page 110**

1   is that the office of the Inspector General makes

2   recommendations to the Board of Police Commissioners on how

3   the Board of Police Commissioner should adjudicate

4   categorical uses of force?

5          MR. FOX:  I'll object on foundation.

6   BY MR. BRENTE:

7      Q.   You can answer.

8          MR. FOX:  Yeah.  Cory, you don't have -- he knows to

9   answer every question unless I instruct him.

10          Do you know the answer, Sal?  If you do, please

11   answer it.

12          THE WITNESS:  My answer to that is my understanding

13   is it has been that the office of Inspector General is

14   involved with the review.  I -- I did not know that they

15   would have been involved with the actual recommendations to

16   the Board.  I just understood that they were involved in the

17   review.

18   BY MR. BRENTE:

19      Q.   Okay.  Let me just ask you this.  Maybe we can

20   shortcut this.

21          Are you aware as you sit here today of any

22   recommendations made by the Inspector General as it relates

23   to your actions and conducts on June 14, 2019?

24      A.   No.  I'm not aware of any recommendations.

25      Q.   The Board of Police Commissioners, you understand as

1    a Los Angeles police officer, has the final say on the

2    adjudication of a categorical use of force, true?

3        A.    Yes.

4        Q.    And a use of deadly force from the Los Angeles

5    Police Department is considered a categorical use of force,

6    true?

7        A.    Yes.

8        Q.    And the Board of Police Commissioners upon review of

9    this incident determined that your tactics substantially

10   deviated without justification from approved department

11   tactical training, true?

12       A.    I don't know if that was verbatim, their findings,

13   but I understand that it was out of policy as determined by

14   the Board.

15       Q.    And as it relates to the drawing and exhibiting of

16   your firearm, the Board of Police Commissioners determined

17   that your drawing and exhibiting of your firearm on June 14,

18   2019, was out of policy, true?

19       A.    True.

20       Q.    And, of course, the Board of Police Commissioners

21   also determined whether or not your use or an officer's use

22   of deadly force is within or without policy, true?

23            MR. FOX:  Foundation.

24            MR. BRENTE:  I'll rephrase it.

25   BY MR. BRENTE:

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                                    Page 112

1        Q.   In this case the Board of Police Commissioners

2    reviewed your use of deadly force, true?

3        A.   Yes.

4        Q.   And is it your understanding that when an officer's

5    involved in an officer-involved shooting, that each and every

6    round that officer fires is adjudicated for in policy or out

7    of policy findings, true?

8        A.   Yes.

9        Q.   So, hypothetically, if an officer fires five rounds

10   in an officer-involved shooting, your understanding is that

11   two of those could be found to be in policy, and three could

12   be found to be out of policy, true?

13            MR. FOX:  So I'm going to object.  It's an

14   incomplete hypothetical.  Also a hypothetical question is not

15   appropriate for a non-expert witness.  So it's objected to on

16   that ground.  Calls for speculation.

17            Go ahead, Sal.  If you understand the question, you

18   may answer it.

19            THE WITNESS:  Yes.

20   BY MR. BRENTE:

21       Q.   The answer to my question is yes?

22       A.   Yes.

23       Q.   And in this case the Board of Police Commissioners

24   determined that every round you fired that day was out of

25   policy, true?

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                     Page 113

```
 1        A.    Yes.

 2        Q.    And the Board of Police Commissioners determined

 3   that all ten rounds failed to comply with LAPD's use of

 4   deadly force policy, true?

 5        A.    Yes.

 6        Q.    And as a result of this incident, there was a

 7   personnel complaint, true?

 8        A.    Yes.

 9        Q.    And you were relieved of duty by the chief on June

10   13 of 2020 and directed to a Board of Rights with a proposed

11   penalty of removal from office, true?

12        A.    Yes.

13        Q.    And do you remember -- so a Board of Rights, it's

14   essentially a tribunal.  It's kind of like a -- like a court

15   trial.  You have lawyer and there's a Department prosecutor

16   that's a Department advocate, and then there is three board

17   members who hear evidence and the testimony of witnesses, and

18   then ultimately reach a decision.

19            Is that your basic understanding of Board of

20   Rights?

21            MR. FOX:  So I'm going to object because it isn't

22   like a court trial.  It isn't a court trial.

23            So the question is misleading and ambiguous.

24            It's also very compound.

25            Go ahead, Sal.
```

1      Q.    Okay.  And you were found guilty by the Board of

2   using excessive force against Kenneth French, true?

3      A.    Yes.

4      Q.    And you were also charged with the Board with

5   failing to see Russell or Paola French before using deadly

6   force, true?

7      A.    I don't recall if that was the verbatim of that

8   count.

9      Q.    Okay.  Were you also -- was one of the counts

10  failure of properly consider the background before using

11  deadly force?

12     A.    I don't recall it being worded like that.

13     Q.    Was that the -- do you understand that was one of

14  the subjects of one the counts against you, failing to

15  properly consider the background before using deadly force?

16     A.    Again, I don't remember it being phrased in that

17  fashion as you're stating it.

18     Q.    Do you remember there being any counts dealing with

19  failure to take into consideration your background?

20     A.    I don't recall.

21     Q.    Were you also charged with improper tactics?

22     A.    That's -- it's vague as it applies to the counts.

23        I don't remember if it was as specific as you stated

24  regarding that count.

25     Q.    Okay.  What about a count alleging improperly

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 116

1    drawing and exhibiting a firearm?

2         A.   I do recall something within that phrase as one of

3    the counts.

4         Q.   And what was the finding on that count?

5         A.   Out of policy.

6         Q.   The Board, you're either found guilty or not guilty;

7    right?

8         A.   Yes.

9         Q.   So you were found guilty of that, true?

10        A.   Yes.

11        Q.   Now, how many times were you interviewed by the

12   Force Investigation Division?

13        A.   As I recall, it was twice.

14        Q.   And when you were interviewed by the Force

15   Investigation Division, were you represented by counsel at

16   the interview?

17        A.   Yes.

18        Q.   And was one of those interviews on June 19th of

19   2019?

20        A.   I don't recall it -- specifically.

21        Q.   Was one of the interviews I'll say shortly after the

22   day of the shooting?

23        A.   I recall it being days after the shooting.

24        Q.   Right.  Within a week?

25        A.   Yes, within a week.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    **Page 117**

1      Q.    And do you remember if your second interview was on

2    February 6 of 2020?

3      A.    I don't recall specifically that date, but I recall

4    it being some months after.

5      Q.    And you knew as a Los Angeles police officer when

6    you were interviewed by FID, as a Department employee, you

7    were required to be truthful with them, true?

8      A.    Yes.

9      Q.    And one of the counts against you at your Board was

10   making false or misleading statements to the Force

11   Investigations Division investigators in your first interview

12   on June 19, 2019, true?

13     A.    Again, I don't recall specifically the date, but

14   yes.

15     Q.    And what was the Board's finding on the allegation

16   that you made false and misleading statements to FID at your

17   first interview?

18     A.    Guilty.

19     Q.    And you were also accused at the Board of making

20   false or misleading statements to FID at your second

21   interview; isn't that true?

22     A.    Yes.

23     Q.    And what was the Board's finding in that regard?

24     A.    Guilty.

25     Q.    And then after the Board made its finding, it had to

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                                    Page 118

1    determine a penalty of perjury for the conduct in the

2    findings, true?

3         A.   Yes.

4         Q.   And the penalty that was determined was removal from

5    office effective July 13, 2020, true?

6         A.   Yes.

7         Q.   And that was issued on January 19th of 2021?

8         A.   I don't recall the specific date, but yes, sometime

9    in January of this year.

10        Q.   Thank you.  Now, as it relates to this lawsuit,

11   there was a form 15-7, 15.7 that was put up, I believe, it

12   was Exhibit 2 that Mr. Galipo put up on the screen.

13        Do you remember seeing that employee's report?

14   A.   Yes.

15        MR. BRENTE:  And, Mr. Fox, I tried to look through

16   my electronic file, and I didn't see that form 15.7 in the

17   discovery.

18        Did I just overlook that in the documents produced

19   by Mr. Sanchez?

20        MR. FOX:  I don't know, Cory, because I have not

21   been involved in that part of the discovery.  I do not

22   know.

23        MR. BRENTE:  Okay.  Well, if it wasn't in there, do

24   you know how Mr. Galipo got it?

25        MR. FOX:  Yeah.  I sent him a copy, to be honest.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                              Page 119

1         I'll be happy to send you a copy, too.

2         MR. BRENTE:  Okay.

3  BY MR. BRENTE:

4    Q.   So Mr. Sanchez, so as it relates to this lawsuit,

5  you were aware of protocol that you were to follow as a Los

6  Angeles police officer if you were named a defendant in a

7  civil lawsuit, and you wanted to request City-paid legal

8  representation, true?

9    A.   May you repeat that question, please.

10   Q.   As an LAPD officer you were aware of the procedure

11 that you were to follow if you were named a defendant in a

12 civil lawsuit, and you wanted to request City-paid legal

13 representation, true?

14   A.   Yes.

15   Q.   And the procedure was that the employee would

16 complete an employee's report also known as an LAPD form

17 15.7, true?

18   A.   Yes.

19   Q.   And Exhibit 2 that Mr. Galipo published, that was

20 the form 15.7 employee's report that you submitted, true?

21   A.   Yes.

22   Q.   And did you -- I'm just trying to -- did I hear you

23 say that you wrote that form 15.7, the contents of it?

24   A.   Yes.

25   Q.   Did anybody assist you with writing that form 15.7?

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.
Salvador Sanchez on 03/10/2021                              Page 120

```
 1      A.    No.

 2      Q.    And did you get a written response to your request

 3   for City-paid legal representation?

 4      A.    Yes.

 5      Q.    And letter was sent to a Mr. John -- I'm going to

 6   spell the last name, S-t-u-m-r-e-i-t-e-r; correct?

 7      A.    I'm not sure of that.  May you repeat that question,

 8   again, sir, being mindful of the last name of the spelling?

 9      Q.    Right.  So the letter from the City in response to

10   your request for City-paid legal representation was sent to

11   an attorney at the Law Firm of Carpenter Rothans,

12   R-o-t-h-a-n-s, and Dumont, D-u-m-o-n-t.  And the lawyer's

13   name is John J. Stumreiter, as I spelled it before;

14   correct?

15      A.    I'm not aware if a letter was sent to the firm or

16   the person that you -- that you stated.

17      Q.    So just so we're clear, it's your testimony as you

18   sit here that you never received notification from the city

19   of Los Angeles as to whether or not your request for

20   City-paid legal representation was going to by granted or

21   denied?

22      A.    I didn't, sir.  I --

23      Q.    You did?  Got a letter?

24      A.    Yes, I did receive a letter.

25      Q.    Okay.  And it -- your request for City-paid legal
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 121

```
 1    representation was denied, true?

 2         A.   Yes.

 3         Q.   And you were informed that the reason that your

 4    request for City-paid legal representation was denied was for

 5    a number of reasons, true?

 6         A.   I don't recall the number of the reasons, but I do

 7    know that it was a letter of denial of paid representation.

 8         Q.   And was one of the reasons that you were informed in

 9    the letter that your request was being denied was because the

10    City determined that your actions in this incident were not

11    performed within the course and scope of your employment?

12         A.   I don't recall the exact verbiage, but I believe it

13    was within -- similar to what you just stated.

14         Q.   You were also told that the City was denying your

15    request for City-paid legal representation in this lawsuit

16    because you acted -- failed to act because of actual fraud,

17    corruption, or actual malice?

18         A.   I recall that, yes.

19         Q.   And were you also informed that your request for

20    City-paid legal representation was being denied because

21    defense of this action on your behalf would create a specific

22    conflict of interest between you and the public entity,

23    specifically the city of Los Angeles?

24         A.   I don't recall that.

25              MR. FOX:  And, Cory, just -- I hate to interrupt
```

1   It's perfect time.  I'll see what my wife --

2           MR. GALIPO:  Dana, I requested a five-minute break

3   if that's okay.

4           MR. FOX:  Five minute is fine.

5           Is that okay with you, Sal?

6           THE WITNESS:  Yes, it is.

7           THE VIDEOGRAPHER:  We're off the record at 3:23.

8           (Recess taken.)

9           THE VIDEOGRAPHER:  Back on the record.  It's 3:31.

10  BY MR. BRENTE:

11      Q.   Mr. Sanchez, in this case you're represented by

12  Mr. Fox and/ or his law firm, true?

13      A.   Yes.

14          MR. FOX:  I hope it's not or.  I hope it's not or.

15          It's Mr. Fox and his law firm.

16          THE WITNESS:  Yes.

17  BY MR. BRENTE:

18      Q.   And Mr. Fox and his law firm are not paid by the

19  city of Los Angeles for your defense, true?

20      A.   Yes.

21      Q.   You were -- Mr. Galipo went over some discovery

22  responses that you provided in this case.  One of them was

23  some discovery responses that I think he reference as Exhibit

24  3 which were discovery responses by you to request for

25  admissions propounded by Paola French.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                                    Page 126

1      Q.   Okay.  And what way was your use of lethal force

2   consistent with your training as a Los Angeles police

3   officer?

4           MR. FOX:  So I'm going to -- the problem is, Cory,

5   that now asks him to go into the facts of this incident.  So

6   it invades his Fifth Amendment rights and privileges, and I'm

7   going to so instruct him.

8           Sal, you may answer.

9           THE WITNESS:  Mr. Brente, I respectfully decline to

10   answer your question based upon my Fifth Amendment rights.

11   BY MR. BRENTE:

12      Q.   And in what way did you draw or exhibit your firearm

13   consistent with LAPD policy and training?

14           MR. FOX:  Same objection, same instruction.

15           THE WITNESS:  Mr. Brente, I respectfully decline to

16   answer your question based upon my Fifth Amendment rights.

17   BY MR. BRENTE:

18      Q.   And in what way was your use of deadly force

19   consistent with your training as a Los Angeles police officer

20   on when you can use deadly force?

21           MR. FOX:  Same objection, same instruction.

22           THE WITNESS:  Mr. Brente, I respectfully decline to

23   answer your question based upon my Fifth Amendment rights.

24           MR. BRENTE:  So request for admission No. 5, if

25   Ms. Masongsong can scroll down, please.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    **Page 127**

```
 1   BY MR. BRENTE:

 2        Q.   All right.  So you're asking about request for

 3   admission No. 5 is to -- oh, got smaller.  There we go --

 4   which it said, "Admit that it was your belief that you were

 5   acting within the course and scope of your employment with

 6   the City as an LAPD officer at the time of the incident.

 7             And as Mr. Galipo pointed out, there's some

 8   objections, and then you admitted that you believe you were

 9   acting within the course and scope of your employment with

10   the City as an LAPD officer at the time of the incident,

11   true?

12        A.   Yes.

13        Q.   And in what way do you believe you were acting

14   within the course and scope of your employment with the City

15   as an LAPD officer at the time you used deadly force?

16             MR. FOX:  And, Sal, you can answer it without

17   discussing any of the specific facts of the incident,

18   please.

19             THE WITNESS:  Again, in my mind I resorted to my

20   LAPD training and experience and acted within the capacity as

21   a police officer.

22   BY MR. BRENTE:

23        Q.   And what specific LAPD training and experience did

24   you rely on in your use of deadly force at the Costco on June

25   14, 2019?
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                              Page 128

1          MR. FOX:  So the question contains his Fifth

2    Amendment rights and privileges, and I'll will so instruct

3    him.

4          But, Sal, you can answer the question.

5          THE WITNESS:  Sir, may you repeat the question,

6    please.

7    BY MR. BRENTE:

8      Q.   My question is:  In what way -- no.

9          My question was:  What LAPD training and experience

10   did you specifically rely on that you believed placed you

11   within the course and scope of your employment when you used

12   deadly force on June 14, 2019?

13         MR. FOX:  And because it's specific to the use of

14   force in this incident, it invades his Fifth Amendment

15   rights.  I would instruct him not to answer.

16         But, Sal, you can answer.

17         THE WITNESS:  Mr. Brente, I respectfully decline to

18   answer your question based upon my Fifth Amendment rights.

19   BY MR. BRENTE:

20     Q.   And your request for admission No. 6, request for

21   admission No. 6 is somewhat similar, but Mr. Galipo asked you

22   about it, and that was asking you admit that it is your

23   belief that you were acting within your official capacity as

24   a police officer for the City Police Department during this

25   incident.  And there were some objections that were

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                     Page 129

```
 1    inserted -- asserted on your behalf, you admitted that,

 2    true?

 3         A.   Yes.

 4         Q.   And in what way were you acting within your official

 5    capacity as a police officer for the City Police Department

 6    during this incident?

 7              MR. FOX:  And, Sal, again, without discussing

 8    specific facts, you may answer the question.

 9              THE WITNESS:  Within the official capacity as and in

10    accordance to LAPD policy and state law to protect myself and

11    to protect others from -- from it -- from -- from threat of

12    death or serious bodily injury.

13    BY MR. BRENTE:

14         Q.   And what threat of death or serious bodily injury

15    did you perceive to exist at the time you used deadly

16    force?

17              MR. FOX:  Because this is now asking about the

18    specific incident and specific facts of the incident, I want

19    to object that it invades his Fifth Amendment rights and

20    privileges and instruct him not to answer.

21              Sal, you can respond.

22              THE WITNESS:  Mr. Brente, I respectfully decline to

23    answer your question and I do that based upon my Fifth

24    Amendment rights.

25    BY MR. BRENTE:
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    **Page 130**

1      Q.   And in what way do you believe your use of deadly

2   force was consistent with LAPD policy and procedure?

3           MR. FOX:  Same objections on Fifth Amendment grounds

4   and same instruction.

5           THE WITNESS:  Mr. Brente, I respectfully decline to

6   answer your question based upon my Fifth Amendment rights.

7   BY MR. BRENTE:

8      Q.   Request for admission No. seven is somewhat similar,

9   but Set 7 asks you to admit that you were purporting to act

10  in the performance of your official duties as a police

11  officer for the City of Los Angeles during this incident, and

12  aside for some objections asserted on your behalf, you

13  admitted this, true?

14     A.   Yes.

15     Q.   And in what way were you purporting to act in the

16  performance of your official duties as a police officer for

17  the City during this incident?

18          MR. FOX:  And, Sal, you can answer without

19  discussing the specific facts of the incident, please, if you

20  can.

21          THE WITNESS:  Yes.  Again, I was acting within my

22  official capacity as a police officer to protect life.

23  MR. BRENTE:

24     Q.   And in what specific manner were you acting within

25  your official capacity to protect life?  What did you do?

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                    Page 131

```
 1              MR. FOX:  So because of the last part of your

 2    question, I'm going to object on the grounds it invades his

 3    Fifth Amendment rights and privileges and so instruct him.

 4              But, Sal, you may answer the question.

 5              THE WITNESS:  Mr. Brente, I respectfully decline to

 6    answer your question based upon my Fifth Amendment rights.

 7    BY MR. BRENTE:

 8       Q.  At the time of this officer-involved shooting, you

 9    were off -- or this shooting, at the time of the shooting,

10    you were off-duty, true?

11              MR. GALIPO:  Objection.  Vague and ambiguous as

12    phrased.

13              MR. FOX:  And I think it's been asked and answered.

14              But go ahead, Sal.  You can answer it again.

15              THE WITNESS:  May you repeat the question, please.

16    BY MR. BRENTE:

17       Q.  At the time of the shooting, you were off-duty,

18    true?

19              MR. GALIPO:  Objection.  Vague and ambiguous as

20    phrased.

21              THE WITNESS:  Prior to the shooting I was off-duty;

22    that's true.

23    BY MR. BRENTE:

24       Q.  When you went to the Costco, you weren't being PAID

25    by the City of LA --
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 137

1   by the Department.

2        Q.   When you say the off-duty directive, are you

3   thinking of the training bulletin that I asked you some

4   questions about titled "Off-duty actions?"

5        A.   Yes.  That and the manual sections that have been

6   referenced at the beginning.

7        Q.   And is there anything that you're aware of in the

8   training bulletin on off-duty action that says when you used

9   force off-duty; that at the moment you used the force, your

10   status transitions to an on-duty status?

11        MR. GALIPO:  I'll object as calling for speculation

12   without the document in front of him.

13        MR. FOX:  I'm going to join.

14        THE WITNESS:  I don't recall the specific that

15   states that.

16   BY MR. BRENTE:

17        Q.   And is there anything, to your recollection, in the

18   LAPD use-of-force policy that says when an officer who is

19   off-duty uses deadly force, at the moment they use the force,

20   their status transitions from off-duty to on-duty?

21        A.   No.  I don't recall anything explicitly stating

22   that.

23        Q.   And you said in an earlier answer that you were also

24   relying on state law for your belief, true?

25        A.   Yes.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 139

```
 1       Q.   All right.

 2            MR. GALIPO:  Cory, do you have any estimate?

 3            Any estimate, Cory?

 4            MR. BRENTE:  Yeah.  Maybe -- I'm just going to walk

 5       through some more of his off days.  I don't know -- 30, maybe

 6       less.

 7            MR. GALIPO:  All right.

 8            MR. BRENTE:  If Ms. Masongsong could assist us and

 9       put that Exhibit -- the request for admission which was

10       Exhibit 3.

11            MR. GALIPO:  Okay.  I would be happy to do it.

12            I would guess that you're going to get a similar

13       answer that you did before, but we'll see what happens.

14            MR. BRENTE:  Well, and part of this as you

15       understand with respect to "everyone" in this room is we have

16       to create a record in case you can make any motion practice.

17       So we have to make sure we're creating a complete record as I

18       know you appreciate and understand.

19       BY MR. BRENTE:

20       Q.   So No. 9, request for admission No. 9.

21            All right.  So request for admission No. 9 says,

22       "Admit that the City paid you for the time you spent being

23       interviewed by the City investigators regarding this

24       incident, and there was some objections asserted by your

25       counsel, and then you admitted that, true?
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 140

```
 1        A.    Yes.

 2        Q.    All right.  So for your interviews by the LAPD, you

 3   were compelled by FID investigators and under the rules and

 4   regulations of the LAPD to give a statement to the Department

 5   investigators, true?

 6        A.    Yes.

 7        Q.    And your understanding was if a Los Angeles Police

 8   Department wanted to get a statement from you, a compelled

 9   statement from you, they would be required to compensate you

10   for the time you spent being interviewed, true?

11             MR. FOX:  Objection.  Calls for legal conclusion,

12   foundation.

13             MR. GALIPO:  Join.

14   BY MR. BRENTE:

15        Q.    Go ahead, Mr. Sanchez.

16        A.    Yes.

17        Q.    And you were paid for the time you spent being

18   interviewed by FID, true?

19        A.    Yes.

20        Q.    And RFA No. 10 ask you to admit you did a

21   walk-through at the scene with the City investigators

22   regarding this incident, and there's some objections

23   inserted, and you admitted that, true?

24        A.    Yes.

25        Q.    And as a Los Angeles police officer who was involved
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 146

1   the specifics of the incident.

2           MR. FOX:  I would agree with that, but the answers

3   would --

4           MR. BRENTE:  That's fine.  I can go through it.  I

5   can go through it --

6           MR. FOX:  Hold on.  Hold on.  Hold on.  Hold on.

7           I think the question as phrased, Cory, was just

8   overbroad.  I think if you're more specific, you're going to

9   get a confirmation from Sal and me that the answer would

10  be -- the response would be the exact same.

11          MR. BRENTE:  Okay.  Probably easier to just ask him

12  and have you instruct him.

13          MR. FOX:  Oh, okay.

14          MR. BRENTE:  Okay.

15  BY MR. BRENTE:

16      Q.   On what facts do you base your denial that you were

17  off-duty at the time of the shooting?

18          MR. FOX:  So I'm going to object because it does

19  invade attorney-client privilege.  It also goes to the

20  specific details of the incident, and he has asked and

21  answered this to a certain extent, but to the extent it

22  involves the facts of the incident, it invades Fifth

23  Amendment privilege and I'll instruct him not to answer it.

24          THE WITNESS:  Mr. Brente, I respectfully decline to

25  answer your question based upon my Fifth Amendment rights.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 147

1          MR. BRENTE:  Okay.  So let's take five minutes so I

2     can confer with Ms. Smith, and we might be done.

3          THE VIDEOGRAPHER.  We're off the record at 4:10.

4          (Recess taken.)

5          THE VIDEOGRAPHER:  Back on the record 4:18.

6          MR. BRENTE:  Thank you.  I just have a few more and

7     before I ask them, I just want to let particularly Mr. Fox

8     know I'm just asking these because I'm not completely clear

9     if these were asked.  I'm assuming you're going to object and

10    instruct Mr. Sanchez not to answer and he's going to invoke

11    the Fifth.  But it's just not clear to me that these

12    questions were specifically asked in this way.  So I'm going

13    to ask --

14         MR. FOX:  Sure.

15    BY MR. BRENTE:

16         Q.   So Mr. Sanchez, why did you use deadly force on June

17    14, 2019, at the Costco in Corona?

18         MR. FOX:  So, Cory, I appreciate it.  No problem.

19    If it was asked, I'm happy to let you ask again, but it will

20    be an instruction not to answer because it violates his Fifth

21    Amendment rights against self-incrimination.

22         Sal, you can answer, please.

23         THE WITNESS:  Mr. Brente, I respectfully decline to

24    answer your question based upon my Fifth Amendment rights.

25    BY MR. BRENTE:

PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.
Salvador Sanchez on 03/10/2021                                Page 153

```
 1   employee's report form 15.7, you say (reading):

 2           "On June 14,2019, I, Officer Salvador Sanchez,

 3   serial number 41084, was off-duty or shopping with my wife

 4   and one-and-a-half-year old son at the Costco located in the

 5   city of Corona, true?  Is that true?

 6       A.   Yes.

 7           MR. GALIPO:  I'll object.  The document speaks for

 8   itself.

 9   BY MR. BRENTE:

10       A.   The next paragraph says (reading):

11           "While holding my son in my arms, I was brutally

12   attacked by surprise without provocation by Kenneth French.

13   I was violently injured on my head and suffered serious

14   bodily injury."

15           Is that true?

16           MR. GALIPO:  I'm going to object --

17           MR. FOX:  Hold on --

18           MR. GALIPO:  I'm going to object, the document

19   speaks for itself --

20           MR. FOX:  I apologize, Dale.  I stepped on your

21   answer, your objection.

22           Cory, are you asking him when you say is it true, is

23   it true that's what he wrote, or are you asking him to -- is

24   the statement itself factually true?

25           MR. BRENTE:  Well, my first question is if that's
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 155

```
 1  accordingly --

 2          (Simultaneously speaking.)

 3          MR. FOX:  That's correct --

 4          THE WITNESS:  -- to answer --

 5          MR. BRENTE:  Let me ask another question.

 6          MR. FOX:  Is that withdrawn, then?

 7          MR. BRENTE:  That's withdrawn, yes.

 8          MR. FOX:  Okay.

 9  BY MR. BRENTE:

10      Q.   So in this -- you told me already in previous

11  examination that you, yourself, wrote this Exhibit 2, true?

12      A.   True.

13      Q.   So you wrote, "While holding my son in my arms, I

14  was brutally attacked by surprise without provocation by

15  Kenneth French.  I was violently injured on my head and

16  suffered serious bodily injury."

17          You wrote that, true?

18      A.   Yes.

19      Q.   And in what way were you brutally attacked by

20  surprise without provocation by Kenneth French?

21          MR. FOX:  So this invades his Fifth Amendment

22  rights, and I will instruct him accordingly not to answer

23  based on his Fifth Amendment rights.

24          But I'll let Sal respond nonetheless.

25          THE WITNESS:  Mr. Brente, I respectfully decline to
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    **Page 156**

1    answer your question based upon my Fifth Amendment rights.

2    BY MR. BRENTE:

3        Q.   And you wrote, "I was violently injured on my head

4    and suffered serious bodily injury."

5             True?  You wrote that?

6        A.   Yes.

7        Q.   And in what way were you violently injured on your

8    head and in what way did you suffer serious bodily injury?

9             MR. FOX:  Same problem.  So the same objection and

10   the same instruction.

11            Sal.

12            THE WITNESS:  Mr. Brente, I respectfully decline to

13   answer your question based upon my Fifth Amendment rights.

14   BY MR. BRENTE:

15       Q.   And you wrote in Exhibit 2 that, "I feared for my

16   life and my son's life as I believed we were in danger of

17   death or serious bodily injury by Kenneth French."

18            You wrote that, true?

19       A.   Yes.

20       Q.   And on what facts do you base your belief that you

21   feared for your life and your son's life and believed that

22   you were in danger of death or serious bodily injury by

23   Kenneth French?

24            MR. FOX:  The question is objectionable because it

25   invades his Fifth Amendment privileges and rights, and I

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 157

1   would instruct him accordingly because it invades his Fifth

2   Amendment rights against self-incrimination.

3            Sal, you can respond to it.

4            THE WITNESS:  Mr. Brente, I respectfully decline to

5   answer your question based upon my Fifth Amendment rights.

6   BY MR. BRENTE:

7       Q.   Thank you.  And further down you wrote,

8   "Additionally, Kenneth's parents, Paola and Russell French,

9   were unintentionally injured by my actions."

10           You wrote that, true?

11      A.   I'm attempting to follow you.  Where --

12      Q.   Okay.  Sorry.  So it's further down, so like in the

13  next paragraph there is one sentence in there that says,

14  "Additionally, Kenneth's parents, Paola French and Russell

15  French were unintentionally injured by my actions."

16           You wrote that, true?

17      A.   Yes.

18      Q.   And what do mean when you say and/ or write that

19  Paola and Russell French were unintentionally injured by your

20  actions?

21           MR. FOX:  I didn't hear the beginning of the

22  question, Cory.

23           MR. BRENTE:  So I was asking him what he means when

24  he writes that Kenneth's parents, Paola and Russell French

25  were unintentionally injured by my actions.

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 158

```
 1              MR. FOX:  Got to.  Thank you for clarifying.

 2              Because it invades his Fifth Amendment privileges or

 3     his privilege against self-incrimination, I'm going to advise

 4     him not to answer the question.

 5              Sal can respond.

 6              THE WITNESS:  Mr. Brente, I respectfully decline to

 7     answer your question based upon my Fifth Amendment rights.

 8     BY MR. BRENTE:

 9         Q.   Thank you.

10              MR. BRENTE:  I don't have any other questions.

11              MR. GALIPO:  No further questions.

12              Dana, I do things the old fashion way.  If it's okay

13     with you, I can send your office the original.  You make it

14     available for the witness or Mr. Sanchez to review.

15              30 days after receipt, is that enough time for you?

16              MR. FOX:  It is.

17              MR. GALIPO:  And then you'll notify all parties of

18     signing and any changes within 15 days.  Your office shall

19     maintain custody of the original, make it available for any

20     future proceedings.  And we'll agree if the original is

21     unsigned or otherwise unavailable, that a certified copy can

22     be used in its place for any and all purposes.

23              MR. FOX:  Yes.  And a certified copy may be used

24     incorporating any changes, if any, made by the witness.

25              Other than that, so stipulated.
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**

Salvador Sanchez on 03/10/2021                                    Page 159

1          MR. BRENTE:  So stipulated.  And, Jinna, you know my

2    standard order, please.

3          COURT REPORTER:  Of course, I do.  Yes.

4          MR. BRENTE:  And with the videographer, sir, can we

5    please get a synced copy of the video of the transcript?

6          THE VIDEOGRAPHER:  Yes.

7          MR. FOX:  And, Stephen, this is Dana Fox.  I would

8    order the same synced video as well, please.

9          THE VIDEOGRAPHER.  Got it --

10         MR. GALIPO:  Okay.  Go ahead.  I'm sorry.

11         THE VIDEOGRAPHER:  Did you want to add something on

12   the record?

13         MR.  GALIPO:  No.  I apologize.  Go ahead, Stephen.

14         THE VIDEOGRAPHER:  This concludes the deposition of

15   Sal Sanchez.  And we're off the record at 4:35.

16         (Deposition proceeding concluded at 4:31 p.m.)

17                        *   *   *

18

19

20

21

22

23

24

25

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 160

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3   Case Name:  Paola French, et al., vs. City of Los Angeles, et

 4   al.

 5   Date of Deposition:  March 10, 2021

 6   Job No.:  332601

 7

 8           I, _____, hereby certify

 9   under penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11           Executed this _____ day of _____,

12   20____, at _____, California.

13

14

15

16

17

18                        _____
                                      SALVADOR SANCHEZ
19

20

21

22

23

24

25
```

**PAOLA FRENCH, ET AL. vs CITY OF LOS ANGELES, ET AL.**
Salvador Sanchez on 03/10/2021                                    Page 161

```
 1                          CERTIFICATE

 2                              OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8            That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15            Further, that the foregoing is an accurate

16    transcription thereof.

17            I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  March 10, 2021.

23

24            _____
              Jinna Grace Kim, CSR No. 14151

25
```